[Cite as *Gysegem v. Ohio State Univ. Wexner Med. Ctr.*, 2021-Ohio-4496.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| John Timothy Gysegem et al., | : | |
| Plaintiffs-Appellants, | : | No. 20AP-477 |
| | | (Ct. of Cl. No. 2018-113JD) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ohio State University Wexner Medical Center, | : | |
| | : | |
| Defendant-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on December 21, 2021

**On brief**: *Murray & Murray Co.*, *L.P.A.*, *Charles M. Murray*, and *Joseph A. Galea*, for appellants. **Argued**: *Charles M. Murray*.

**On brief**: *Dave Yost*, Attorney General, *Jeffrey L. Maloon*, and *Brian M. Kneafsey*, *Jr.*, for appellee. **Argued**: *Jeffrey L. Maloon*.

APPEAL from the Court of Claims of Ohio

BROWN, J.

{¶ 1} This is an appeal by plaintiffs-appellants, John Timothy Gysegem and Cheryl Gysegem, from a judgment of the Court of Claims of Ohio finding in favor of defendant-appellee, Ohio State University Wexner Medical Center ("appellee" or "OSUWMC"), on appellants' claims for medical negligence and loss of consortium.

{¶ 2} The following factual background is taken primarily from the findings of fact set forth in the decision of the Court of Claims following a bench trial on the issues of liability and damages. Appellants were married on September 15, 1995. During the last five years, appellant John Timothy Gysegem (individually "Tim") "suffered pain resulting from his surgeries at OSUWMC." (Decision at 2.)

{¶ 3}    In February 2015, Tim, who had previously been diagnosed with "monoclonal B cell lymphocytosis," presented to the emergency room at OSUWMC after experiencing abdominal pain and other symptoms. Patients suffering from monoclonal B cell lymphocytosis "may have an increased risk of infection."  (Decision at 3.)

{¶ 4}    On February 23, 2015, a CT scan was performed on Tim, and a radiologist noted "the CT scan showed an extraluminal collection containing an air-fluid level adjacent to the appendix with an appendicolith in this region, measuring approximately 2.6 x 4.4 cm," and "consistent with a contained fluid collection secondary to perforated appendicitis."   In "layman's terms," an extraluminal collection is "an abscess." An appendicolith is typically "a hardened ball of stool that may be a nidus for an infection." (Decision at 3.)

{¶ 5}    The OSUWMC emergency department requested a surgical consultation, and Dr. Daniel Eiferman, who was the on-call surgeon on that date, responded to the emergency department's request.   Dr. Eiferman is "board certified in general surgery and surgical critical care."  According to the testimony of Dr. Eiferman, his practice typically consists of "intra-abdominal surgeries—hernia, gallbladders, appendix, bowel restriction, ulcer surgeries; cases like that."  Dr. Eiferman estimated that "as of February 2015, he had performed about 100 to 200 laparoscopic appendectomies."  (Decision at 3.)

{¶ 6}    On February 24, 2015, he performed a laparoscopic appendectomy on Tim at OSUWMC.  Dr. Eiferman "does not have a specific recollection" of the surgery he performed on Tim, and the surgical note from that procedure "does not reference whether the appendicolith identified in the CT scan of February 23, 2015 was removed during the laparoscopic appendectomy."  According to Dr. Eiferman "he would have used a surgical instrument to get out what's inside that abscess cavity, that pus, any stones, any inflammatory debris."  On February 26, 2015, Tim was discharged from the hospital "with instructions to follow up with Dr. Eiferman."  (Decision at 4.)

{¶ 7}    Two or three days after his discharge, Tim "became feverish, * * * started to turn yellow, and * * * had pain in his right side."  (Decision at 4.)  Tim and appellant Cheryl Gysegem (individually "Cheryl") returned to the emergency room at OSUWMC, and Tim was readmitted to the hospital.

{¶ 8}    On March 1, 2015, a CT scan was taken of Tim's abdomen and pelvis.  A physician reviewing the CT scan wrote "in a section labeled IMPRESSION; * * * Mild

thickening and fluid attenuation inferior to the liver, bordering the right perinephric fascia. There is a tiny density within this area of thickening, not seen previously." The physician further noted: "Although well separated from the site of appendectomy, the findings may reflect a small amount of complicated fluid, with a small calcification/calcified structure, of uncertain relationship to the previously inflamed appendix." (Decision at 4.) The physician also wrote: "Gallbladder mildly dilated, possibly due to fasting. Multiple dependent gallstones again demonstrated. Choledocholithiasis is again demonstrated." (Decision at 5.)

{¶ 9} On March 3, 2015, Tim underwent "an endoscopic retrograde cholangiopancreatography (ERCP) with sphincterotomy to evaluate a potential biliary obstruction." The medical note "following the ERCP" indicated "numerous stones and sludge were removed." An interventional radiology team was consulted "to aspirate a fluid collection." On March 4, 2015, the radiology team "drained 10 ml of fluid, which was sent for culture." (Decision at 5.)

{¶ 10} On March 9, 2015, Tim was discharged from OSUWMC "with instructions to schedule a follow-up appointment with Dr. Eiferman." During that follow-up appointment, Dr. Eiferman "recommended a laparoscopic cholecystectomy to remove [Tim's] gallbladder." (Decision at 5.)

{¶ 11} On March 27, 2015, Tim underwent a laparoscopic cholecystectomy performed by Dr. Eiferman at OSUWMC. A physician who assisted Dr. Eiferman dictated a surgical note reviewed by Dr. Eiferman. The surgical note states that Tim's gallbladder "was * * * placed into an EndoCatch bag, however, during removal from the umbilical port, the EndoCatch bag did open. Despite this, the gallbladder was able to be removed out in one complete piece." The note further states: "We searched around the surgical areas and found that there was no evidence of any stones that had dropped or scattered in the abdomen. The gallbladder fossa was then irrigated copiously." (Decision at 5.) Dr. Eiferman "did not perform a complete peritoneal lavage based on concern that to do so may result in adverse consequences, such as spreading bile in the body's cavity." (Decision at 5-6.)

{¶ 12} Tim "began to have pain at the port site where the laparoscopic surgeries were performed" and, subsequently, a green, pus fluid "began to drain from the port site on [his] body." In October 2015, Tim met with Dr. Eiferman, and the physician ordered a CT scan

of Tim's abdomen and pelvis. A physician who interpreted the CT scan noted "a fluid collection with irregular thick soft tissue rim anteriorly in the anterior abdomen that tracks into the periumbilical area with probable external communication. This could be a chronic postoperative collection/hematoma. Superimposed infection is difficult to exclude. No definite contrast noted within this collection." (Decision at 6.)

{¶ 13} On October 8, 2015, Dr. Eiferman performed "an exploratory laparotomy" on Tim, "during which Dr. Eiferman found an abscess and seven calculi (stones) in [his] belly button." Dr. Eiferman theorized "that the calculi must have somehow gotten out of the gallbladder and became lodged in the area where Dr. Eiferman later discovered them." Dr. Eiferman testified that he believed "the stones that were found in 2015 are likely related to the gallbladder surgery." (Decision at 6.)

{¶ 14} In July 2016, Tim "experienced right upper quadrant pain." Dr. Jonathan R. Wisler evaluated Tim "because Dr. Eiferman was unavailable." On July 21, 2016, Dr. Wisler stated in a progress note he would order a CT scan "and RUQ ultrasound." (Decision at 6.)

{¶ 15} A physician reviewing a CT scan of July 22, 2016 wrote: "IMPRESSION: 1. Rim-enhancing septated fluid collection posterior to the right hepatic lobe. This is amenable to percutaneous drainage. 2. A few small fluid collections are seen near the transverse colon, too small for drain placement." (Decision at 7.)

{¶ 16} A physician who reviewed an ultrasound taken July 25, 2016 wrote: "IMPRESSION: 1. No gallstones are seen in the visualized portion of the common bile duct. 2. Fluid collection posterior to the liver, similar to prior CT. This could represent a hematoma or an abscess." (Decision at 7.) The reviewing physician discussed the results with Dr. Eiferman on July 25, 2016.

{¶ 17} Dr. Eiferman consulted with members of an interventional radiology team who "decided to aspirate the fluid collection in the right upper flank by means of ultrasound guidance." This procedure, performed on July 27, 2016, "resulted in the aspiration of 300 milliliters of green purulent fluid and the placement of a drain." (Decision at 7.) On July 29, 2016, Tim was discharged with instructions to see Dr. Eiferman on August 9, 2016.

{¶ 18} Tim saw Dr. Eiferman as scheduled and the physician removed the drain during the appointment. Dr. Eiferman, as well as other medical professionals at OSUWMC, "periodically saw Tim * * * during the next twelve months or so." Tim then "underwent removal of an abdominal wall abscess in October 2016, drainage of a chest wall abscess in

November 2016, drainage of a perihepatic fluid collection in January 2017, and drainage of an abdominal wall abscess in June 2017." (Decision at 7.)

{¶ 19} On August 15, 2017, Tim "presented to the OSUWMC emergency department due to, among other things, shortness of breath, increasing fatigue, muscle aches, and confusion." (Decision at 7.) A CT scan taken of Tim on August 16, 2017, "suggested: Interval enlargement of loculated perihepatic fluid collection along the right posterior lateral aspect of the liver. Sterility of this collection cannot be determined on CT." (Decision at 8.)

{¶ 20} Dr. Steven M. Steinberg, the head of the surgery division, was consulted. Dr. Steinberg is a professor of surgery at The Ohio State University, and he has held faculty appointments at the State University of New York at Buffalo, Tulane University, and Case Western Reserve University. He is a "self-described acute care surgeon," and estimated that, "as of 2017, he had performed 'hundreds' of appendectomies and treatment of ruptured appendixes and 'hundreds' of laparoscopic cholecystectomies." (Decision at 8.)

{¶ 21} Dr. Steinberg advised Tim and Cheryl that the CT scan "demonstrated an abscess in an area not previously seen and that it had encompassed the right lung, had gone through the diaphragm, and had invaded the chest." He recommended "an exploratory laparotomy with an incision and drainage of the fluid collection." Dr. Steinberg "was concerned at the time that there was retained, either stone or fecalith, that was causing the abscess to recur." (Decision at 8.)

{¶ 22} On August 17, 2017, Dr. Steinberg performed "an exploratory laparotomy" and "found the right lobe of [Tim's] liver adhered to the anterior abdominal wall." According to a surgical note edited by Dr. Steinberg, "3-400 ml of pus was obtained; the pus was cultured, suctioned, and irrigated until the fluid ran clear." Dr. Steinberg "explored the abscess cavity using curettes and a finger, looking for foreign bodies such as retained gallstones," but "[n]one were identified." (Decision at 8.) Dr. Steinberg "did not perform a complete peritoneal lavage; instead he irrigated the abscess cavity, above the liver and on the inside of the abscess cavity itself." (Decision at 8-9.)

{¶ 23} Dr. Steinberg saw Tim for follow-up care. In October 2017, Dr. Steinberg ordered a CT scan because Tim "began to exhibit symptoms again, i.e., night sweats and complaints of not feeling well." The report of the CT scan "indicated: 1. Interval resolution of the perihepatic fluid collection identified on prior studies. Interval removal of the

previously identified perihepatic drain. 2. Redemonstration of pneumobilia, likely related to prior sphincterotomy and cholecystectomy. 3. Stable hyperdense lesions within the bilateral kidneys, likely representing hemorrhagic or proteinaceous cysts. 4. Nonobstructive right renal calculi." (Decision at 9.)

{¶ 24} In December 2017, Dr. Steinberg ordered a CT scan because Tim's symptoms had worsened. A CT scan, taken on December 19, 2017, "showed, among other things, a new oval collection medial to the liver dome, which could have been a subphrenic abscess or a sterile collection." (Decision at 9.)

{¶ 25} Dr. Steinberg requested the involvement of a thoracic surgeon regarding Tim's care, and the surgeon recommended further surgery to drain the area identified on the CT scan. During that surgery, Dr. Steinberg "drained the component of the abscess that was in the abdomen and a thoracic surgeon drained the collection that was in the chest." Dr. Steinberg "inquired of another surgeon about other possible approaches," but the other surgeon "did not have any other ideas." (Decision at 9.)

{¶ 26} Dr. Steinberg last saw Tim during an office visit in January 2018. Dr. Steinberg sent a letter wherein he terminated the physician-patient relationship after appellants initiated this litigation.

{¶ 27} On January 26, 2018, appellants filed their complaint alleging claims for medical malpractice and loss of consortium. The Court of Claims conducted a bench trial beginning March 2, 2020. In addition to testimony by Tim and Cheryl, appellants presented the testimony of their experts, Drs. Ralph Silverman and John Schaefer (whose deposition testimony was read at trial). Appellee presented the testimony of Dr. Eiferman and its experts, Dr. Steinberg and (by deposition) Dr. Hari Nathan.

{¶ 28} On September 8, 2020, the Court of Claims issued its decision, finding appellants "have not proven by a preponderance of the evidence that OSUWMC should be held liable for medical malpractice or a derivative loss of consortium." (Decision at 15.) In its decision, the Court of Claims concluded that Dr. Eiferman "did not breach the standard of care during the laparoscopic appendectomy by failing to remove the appendicolith that was identified in the CT scan of February 23, 2015, based on the evidence presented and in agreement with OSUWMC's experts." (Decision at 13.) The Court of Claims further determined, with respect to the laparoscopic cholecystectomy, that Dr. Eiferman "met the standard of care * * * when he searched the surgical areas and when, after he found no

evidence of any gallstones that had dropped or scattered in the abdomen, he 'copiously' irrigated the gallbladder fossa." (Decision at 14.) The decision of the Court of Claims was journalized by judgment entry filed that same date.

{¶ 29} On appeal, appellants set forth the following three assignments of error for this court's review:

> I. THE TRIAL COURT'S JUDGMENT IN FAVOR OF THE DEFENDANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> II. THE TRIAL COURT ERRED IN CONSIDERING SPECULATIVE EXPERT TESTIMONY IN VIOLATION OF EVID.R. 702 AND 703.
>
> III. THE TRIAL COURT ERRED IN PERMITTING HABIT TESTIMONY IN VIOLATION OF EVID.R. 406.

{¶ 30} Under the first assignment of error, appellants contend the judgment of the Court of Claims was against the manifest weight of the evidence. Appellants argue that all witnesses agreed that, after the appendix was removed from Tim's right abdomen on February 24, 2015, an object or stone was again found in his right abdomen on the CT scan taken March 1, 2015. Appellants further argue the witnesses agreed the stone likely caused the second abscess that Tim suffered and that was drained by Dr. Eiferman. Appellants maintain the credible evidence presented indicates Dr. Eiferman was negligent in leaving behind an appendicolith after the February 24, 2015 appendectomy.

{¶ 31} In general, "[c]ivil '[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-999, 2013-Ohio-5140, ¶ 17, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. A reviewing court " 'should not substitute its judgment for that of the trial court when there exists * * * competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial judge.' " *Id.* at ¶ 8, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). In "considering whether a civil judgment is against the manifest weight of the evidence, an appellate court is guided by a presumption that the findings of the trier of fact were correct." *Id.,* citing *Seasons Coal Co.* at 79-80. In this respect, " '[t]he underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is

best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.,* citing *Seasons Coal Co.* at 80.

{¶ 32} In order to succeed on a medical malpractice claim, a plaintiff must establish by a preponderance of the evidence: "(1) the standard of care within the medical community; (2) the defendant's breach of that standard of care; and (3) proximate cause between the breach and the plaintiff's injuries." *Gordon v. Ohio State Univ.*, 10th Dist. No. 10AP-1058, 2011-Ohio-5057, ¶ 66, citing *Adams v. Kurz*, 10th Dist. No. 09AP-1081, 2010-Ohio-2776, ¶ 11. The "[p]roof of the recognized standards of the medical community must be provided through expert testimony." *Id.*, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 131-32 (1976).

{¶ 33} In *Bruni*, the Supreme Court of Ohio set forth the burden of proof in a medical negligence case, stating as follows:

> In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things.

*Id.* at paragraph one of the syllabus.

{¶ 34} If a physician "was an employee or agent of appellee, then liability might be imposed upon appellee for any negligent acts performed by that physician under the doctrine of *respondeat superior*." *Latham v. Ohio State Univ. Hosp.*, 71 Ohio App.3d 535, 537-38 (10th Dist.1991), citing *Albain v. Flower Hosp.*, 50 Ohio St.3d 251, 254-55 (1990). We note, in the instant case, the Court of Claims found "Dr. Eiferman was an agent of OSUWMC (a medical center) when he provided care to Tim Gysegem," and therefore "OSUWMC may be liable for any negligent acts performed by Dr. Eiferman under the doctrine of respondeat superior." (Decision at 11.)

{¶ 35} Appellants argue the standard of care relative to the laparoscopic appendectomy required Dr. Eiferman "to safely search for, retrieve, and remove any

appendicoliths that may have escaped from the appendix into the peritoneal cavity, a critical point." (Appellants' Brief at 18.) Appellants note the parties agreed in this case on the proper standard of care, and the Court of Claims adopted the parties' view of that standard. With respect to this issue, the Court of Claims held in part: "The court finds, and the parties seemingly agree, that the standard of care for the laparoscopic appendectomy required Dr. Eiferman to search for and remove the appendicolith identified in the pre-surgery CT scan, so long as the appendicolith could be safely removed." (Decision at 12.)

{¶ 36} In asserting that the evidence indicates Dr. Eiferman left an appendicolith behind after the laparoscopic appendectomy, appellants cite evidence that the CT scan taken on February 23, 2015 (one day before Dr. Eiferman performed the surgery) revealed ruptured appendicitis, and a radiologist warned about "an extraluminal collection containing an air-fluid level adjacent to the appendix with an appendicolith in this region, measuring approximately 2.6 x 4.4 cm * * * consistent with a contained fluid collection secondary to perforated appendicitis." (Plaintiffs' Ex. B.) Appellants contend the evidence is clear that a small, calcified structure appeared in a CT scan of Tim's abdomen on March 1, 2015. Appellants rely on the testimony of their primary expert, Dr. Silverman, who stated that the structure appearing on the post-operative CT scan was "obviously from an appendicolith." (Tr. at 91.) Appellants argue that their other expert, Dr. Schaefer, "likewise opined" that the abscess identified on the March 2015 CT scan was "caused" by an appendicolith. (Appellants' Brief at 20.) According to appellants, the object had to have been the appendicolith, and that it was left behind after the appendectomy as a retained foreign body. Appellants maintain the weight of the evidence favors the likelihood that Dr. Eiferman left a foreign object behind.

{¶ 37} In response, appellee argues only one witness testified the object or stone found on the March 1, 2015 CT scan was the appendicolith, and appellee notes the Court of Claims found the testimony of that witness (Dr. Silverman) to be less than credible. Appellee maintains that, in addressing the issue of whether appellants had proven by a preponderance of the evidence that Dr. Eiferman failed to remove the appendicolith, the Court of Claims properly relied on Dr. Eiferman's testimony regarding the procedure he performed as well as testimony by defense expert witnesses comparing the findings of the post-operative CT scan of March 1, 2015 to the findings of the pre-operative CT scan of February 23, 2015.

{¶ 38} In its decision finding in favor of appellee, the Court of Claims addressed and found unconvincing Dr. Silverman's opinion testimony that "the calcified structure identified on the CT scan of March 1, 2015, is an appendicolith." (Decision at 12.) Specifically, the Court of Claims held in part:

> A post-appendectomy CT scan (CT scan of March 1, 2015) identified "a small calcification/calcified structure, of uncertain relationship to the previously inflamed appendix"—not an appendicolith. Hari Nathan, M.D. (an expert witness for OSUWMC) testified that the calcification that is seen on the CT scan of March 1st is in a different part of the abdomen, that the calcification is contained within some inflammatory soft tissue, and that the calcification is about half the size of what Dr. Nathan measured the appendicolith to be. * * * Dr. Steinberg (a fact witness and expert witness for OSUWMC) testified that the calcification/calcified structure was smaller than the previously identified appendicolith, so that "it's most likely not the same thing." * * * Dr. Steinberg further noted that the original appendicolith (and the structure identified in the CT scan of March 1st) appeared to be calcified, and calcified appendicoliths would not change very rapidly, if at all.

> The court generally finds that Dr. Silverman's opinions are * * * less credible than those offered by OSUWMC's expert witnesses.

> Dr. Eiferman's testimony that, during the laparoscopic appendectomy he would have used a surgical instrument to remove any inflammatory debris, is credible and persuasive for the proposition that the appendicolith identified in the pre-appendectomy CT scan likely was removed during the laparoscopic appendectomy. The court concludes by preponderance of the evidence that Dr. Eiferman did not breach the standard of care during the lap[a]roscopic appendectomy by failing to remove the appendicolith that was identified in the CT scan of February 23, 2015, based on the evidence presented and in agreement with OSUWMC's experts.

(Decision at 12-13.)

{¶ 39} As noted, appellants' theory of the case with respect to the laparoscopic appendectomy was that the appendicolith, observed on the CT scan one day before the appendix was removed, was still present in the CT scan on March 1, 2015 (i.e., appellants argued that Dr. Eiferman was negligent in failing to remove an appendicolith, and that such failure caused the patient's ongoing infections). By contrast, the experts for appellee opined

that the calcified structure appearing on the post-operative CT scan of March 1, 2015, was not the appendicolith observed on the pre-operative CT scan.

{¶ 40} At trial, Dr. Eiferman testified to the surgical procedure he performed in removing Tim's appendix on February 24, 2015. Dr. Eiferman, who is board certified in general surgery and critical care, stated the majority of his surgeries involve "intra-abdominal, hernia, gallbladders, appendix, bowel restriction, [and] ulcer surgeries." (Tr. at 289.) He has performed approximately 100 to 200 laparoscopic appendectomies.

{¶ 41} Dr. Eiferman testified that he was the surgeon on call when Tim presented at the hospital in February 2015. The patient had "right lower quadrant pain" that had been "going on for several days." (Tr. at 297.) He was also experiencing fever and nausea. On February 23, 2015, a CT scan indicated "appendicitis with a rupture of the appendix." (Tr. at 298.) Dr. Eiferman noted that, when an appendix ruptures, "the body forms this inflammatory reaction and tries to wall it off as best it can." (Tr. at 299.)

{¶ 42} Tim "had an abscess on the inside." (Tr. at 299.) The size of the abscess was "approximately 2.6 x 4.4 centimeters," which Dr. Eiferman described as "[v]ery common for ruptured appendicitis." (Tr. at 299-300.) The appendicolith was located inside the abscess and measured between 6.7 to 7 millimeters.

{¶ 43} On reviewing the CT scan, Dr. Eiferman determined "the best course of treatment" for the patient was to "safely get the appendix out and drain his abscess in one operation." (Tr. at 308.) Dr. Eiferman decided to perform the surgery laparoscopically rather than an open surgery procedure. At the time of the surgery, he had performed the procedure "[p]robably in the hundreds by then." Although Dr. Eiferman did not recall this specific appendectomy, he testified as to his "routine" for appendectomies. (Tr. at 309.) He further testified that he had a habit or routine in situations in which an appendicolith is inside an abscess.

{¶ 44} According to Dr. Eiferman, after identifying and removing the appendix, he used a drain for the abscess to "remove what's inside the abscess cavity." (Tr. at 315.) He described the use of a suction irrigator to break up the inflammatory tissue, testifying that he broke up the "mesoappendix from the surrounding inflammation" and then used the irrigator. The suction device is "roughly a centimeter, or 10 millimeters." (Tr. at 316.) At the end of the appendectomy procedure, the abdomen is irrigated using the same device.

{¶ 45}   Dr. Eiferman testified the standard of care requires a physician to "try, if it is safe, to remove an appendicolith or fecalith at the time of the surgery."   The reason for removing an appendicolith or fecalith is because they are "a nidus for infection."   (Tr. at 320.)  He was confident the appendicolith "would not have migrated outside of the abscess."  Dr. Eiferman stated "the body tries pretty hard to wall things off" to prevent the spread of infection.  (Tr. at 323.)  He opined that, had the appendicolith or fecalith not been removed during the appendectomy, it would have been "present on subsequent CT scans."  (Tr. at 324.)  Dr. Eiferman testified that Tim "had multiple CT scans after the appendectomy" and there was "no evidence of fecalith on any of them."  (Tr. at 325.)

{¶ 46}  On cross-examination, Dr. Eiferman agreed that on March 1, 2015, Tim was showing symptoms of infection, and that he probably had bacteria in the peritoneum.  He stated Tim's abscess "came from his ruptured appendix."  (Tr. at 357.)  He agreed that a CT scan of March 1, 2015 indicated a calcified structure.  According to Dr. Eiferman, the structure was "well separated from the side of the appendectomy, bordering the perinephric fascia inferior to the liver," or on the right side below the liver.  (Tr. at 358.)

{¶ 47} Appellants' trial expert witness, Dr. Silverman, stated the standard of care requires that a foreign body, if it can be identified, must be removed; specifically, that appendicoliths are to be removed if they can be found and identified.  He stated it is "particularly important to make sure that that stone or appendicolith that is perforated now on the outside is gone."  (Tr. at 76.)

{¶ 48} Dr. Silverman testified that the CT scan taken March 1, 2015, following the appendectomy surgery, "essentially showed * * * an abscess."  (Tr. at 87.)  He stated there was "a stone on there that wasn't seen before.  And so it actually was seen before, but it - - it's just one of these things that it migrated, moved around."  He stated "this thing has moved from where it was in the right lower quadrant to a different location."  (Tr. at 88.)  Dr. Silverman opined that the object was "an appendicolith."  (Tr. at 91.)

{¶ 49} Dr. Silverman testified he did not see an appendicolith in the 14 other scans performed after the March 1 scan.  He opined that the appendicolith "moved" between the time of the CT scan taken on February 23, 2015, and the CT scan taken on March 1, 2015. (Tr. at 156.)  Dr. Silverman agreed that the radiologist who reviewed the March 1, 2015 CT scan did not mention an appendicolith, and he further agreed that none of the radiologists who reviewed the 14 CT scans since March 1, 2015 identified or mentioned an

appendicolith.  Dr. Silverman acknowledged that a re-accumulation of an abscess can be a recognized complication for a patient with a perforated appendix.

{¶ 50}  Appellee presented the testimony of two medical experts, Drs. Steinberg and Nathan.  Dr. Steinberg is a surgeon and professor of surgery at The Ohio State University. He is board certified in surgery and critical care, and currently practices acute care surgery. Dr. Steinberg has performed "hundreds" of appendectomy procedures, including the treatment of ruptured appendices.  (Tr. at 436.)

{¶ 51} At trial, Dr. Steinberg testified there are a "number of potential complications" with respect to a ruptured appendix.  The main complication is infection, "either intra-abdominal infection or wound infection," as well as "a risk of bowel obstruction later from adhesions."  The treatment of a ruptured appendix generally requires removal of the appendix and to "wash out whatever pus there is in the area."  (Tr. at 442.)

{¶ 52} A patient with a ruptured appendix is more likely to develop subsequent abscesses, and he estimated that approximately "10 to 15 percent" of patients develop abscesses.  (Tr. at 443.)  According to Dr. Steinberg, once a patient has an abscess, "there's always a risk of developing recurrent abscesses regardless of how the initial one is treated." (Tr. at 443-44.)  He stated it is "frequently impossible to remove all that non-viable tissue, which then allows for the growth of more bacteria within it and therefore a second abscess." Dr. Steinberg defined a fecalith as "a piece of material that can range anywhere from just a little piece of stool to a small calcification that is in the lumen of the appendix."  (Tr. at 444.) A rupture can cause an appendicolith or fecalith to come out of the appendix.

{¶ 53}  He testified as to the standard of care for treating a ruptured appendix, noting the first step is to "remove the appendix safely."  Second, "if you believe that there is a fecalith present prior to surgery, you should try to make sure that it's removed.  If that doesn't seem to be within the specimen, you should look around for it."  (Tr. at 445.)

{¶ 54} Dr. Steinberg testified that he reviewed the CT scan of February 23, 2015; at trial, the witness identified the fecalith appearing on that scan, and he noted it "measures about 6 millimeters * * * in diameter."  (Tr. at 460.)  Dr. Steinberg also reviewed approximately 17 or 18 subsequent CT scans of Tim.  In reviewing the CT scan taken on March 1, 2015, he noted remarks regarding a calcified structure.  When asked whether the calcification was an appendicolith or fecalith, Dr. Steinberg testified: "It's not the same size of the appendicolith that we saw.  It's smaller.  So it's most likely not the same thing that we

were calling the appendicolith."  (Tr. at 463-64.)  He stated that a calcified appendicolith would not "change very rapidly, if at all."  (Tr. 464.)

{¶ 55}  When questioned about Dr. Silverman's testimony that certain images might be an appendicolith, Dr. Steinberg stated he could not identify an appendicolith, and that he was "not sure exactly what [Dr. Silverman's] referring to."  (Tr. at 464.)  Dr. Steinberg stated that the image at issue indicated "white stuff * * * inside the lumen of the cecum," and that it "couldn't possibly be a fecalith."  (Tr. at 466.)

{¶ 56}  Dr. Steinberg stated that the cause of the abscess "virtually has to be related to the ruptured appendix." According to Dr. Steinberg, "just a few days before" Tim "had a ruptured appendix," and "[h]e would have no other reason for having an abscess in the same location of the ruptured appendix that would be causing an abscess."  (Tr. at 467.)

{¶ 57}  Dr. Steinberg opined it was appropriate for Dr. Eiferman to remove the appendix on February 24, 2015 as "part of the treatment of ruptured appendicitis."  (Tr. at 467.)  When asked to assume testimony by Dr. Eiferman that it was his typical practice to remove any appendicolith he was able to observe, Dr. Steinberg opined that Dr. Eiferman did not violate the standard of care.  According to Dr. Steinberg, "[y]ou have very few alternatives if you can't find it."  (Tr. at 468.)  The expert testified that "it still meets the standard of care if you've tried to find an appendicolith but you are unable to do so and that you leave it in the abdomen."  (Tr. at 468-69.)

{¶ 58}  Appellee's other expert, Dr. Nathan, is board certified in general surgery and in surgical oncology. He currently has a practice in gastrointestinal surgery, including "pancreatic resections, * * * liver resections, * * * gallbladder resections, bile duct resections, and * * * occasionally complex surgical problems that others may not feel as comfortable handling."  (Nathan Depo. at 7.)

{¶ 59}  Dr. Nathan testified that a post-surgical abscess is "not an uncommon complication of any surgery that violates the gastrointestinal tract, and typically the treatment is dictated by how sick or stable the patient is."  He stated "[m]ost commonly we treat those kinds of abscesses with percutaneous drainage, so not necessarily going back to the operating room but having interventional radiology insert drains."  Antibiotics are often used "as an adjunct to that, at least for a limited time."  (Nathan Depo. at 8.)

{¶ 60}  A post-surgical abscess can result from the presence of bacteria that "can come from any number of places," and which "the body then tries to wall off as part of a

natural reaction to that." (Nathan Depo. at 8.) He described an appendicolith as typically "a stone-like structure that is found in the appendix," most commonly consisting of "hardened feces." In the case of a ruptured appendix, an appendicolith may remain in the appendix or it "can spill out of the appendix." If a surgeon is aware of an appendicolith outside the appendix, it is "best to remove it." (Nathan Depo. at 17.)

{¶ 61} Regarding the February 2015 appendectomy surgery performed by Dr. Eiferman, Dr. Nathan testified he had reviewed "the medical records consisting of clinic notes, radiology reports, pathology reports, operative notes, other procedure reports," and he also reviewed images from "CT scans." (Nathan Depo. at 24.) In reviewing the CT scan taken February 23, 2015, Dr. Nathan "saw a radiopaque object that appeared to be an appendicolith," and he "measured the size of that." The object measured "[s]ix millimeters in greatest dimension." (Nathan Depo. at 25.)

{¶ 62} Dr. Nathan also reviewed the CT scan of March 1, 2015, and he "did not" see the six-millimeter appendicolith that he had measured on the CT scan of February 23, 2015. He stated that "[i]n the vicinity where the previous collection and appendicolith had been, there was a small fluid collection." The measurement was "[t]hree millimeters in greatest dimension." (Nathan Depo. at 26.) When asked his opinion whether the two objects were the same from the two different CT scans taken approximately one week apart, Dr. Nathan stated: "I do not think those are the same object, no." (Nathan Depo. at 27.)

{¶ 63} With respect to his opinion as to the cause of the abscess indicated on the March 1 CT scan, Dr. Nathan testified: "An abscess after perforated appendicitis isn't uncommon just from the spillage of bacteria, and I suspect that there was residual bacteria causing that abscess to happen." (Nathan Depo. at 27.)

{¶ 64} Dr. Nathan opined it was appropriate for Dr. Eiferman to remove Tim's appendix on February 24, 2015, as the patient "presented with symptoms consistent with perforated appendicitis, and not operating would have run the risk of ongoing contamination of the abdomen and him getting sicker." (Nathan Depo. at 27.) Dr. Nathan opined Dr. Eiferman met the standard of care in performing the laparoscopy appendectomy. He stated "it appeared that [Dr. Eiferman] used the appropriate technique to divide the appendix and to remove it from the cecum as well as to divide the blood supply to the appendix." (Nathan Depo. at 29.)

{¶ 65} Dr. Nathan did not observe an appendicolith on subsequent CT scans, and he concluded it was "removed at the time. There's nowhere else that it could have gone." According to Dr. Nathan, if the appendicolith had still been present after the February 24, 2015 appendectomy, he would expect to have seen it on the CT scan of March 1, 2015, but he "did not." (Nathan Depo. at 29.) He further noted the radiologist "did not" report an appendicolith on that film. (Tr. at 30.) Dr. Nathan opined that Dr. Eiferman removed the appendix and its contents.

{¶ 66} Dr. Nathan testified that the standard of care in order to identify an appendicolith during the appendectomy procedure required "an examination in the immediate vicinity of the appendix and where the known spillage was," as well as "evacuation of the obviously spilled contents of stool." He stated it was not part of the standard of care to explore other areas of the peritoneal cavity other than the specific area of the appendix. Dr. Nathan noted that the "contamination is most commonly localized to that area of the abdomen, the right lower quadrant, and in the absence of any evidence to the contrary * * * there's no reason to be exploring the rest of the abdomen in that situation." (Nathan Depo. at 31.) He cited "the possibility that in irrigating, one can take bacteria that are localized to the right lower quadrant and cause them to spread to other areas of the abdomen, creating a new problem that wasn't there before." (Nathan Depo. at 32.)

{¶ 67} Dr. Nathan testified that an abscess is a recognized complication of a ruptured appendix. According to Dr. Nathan, "[d]espite one's best efforts to remove that contamination, you can never sterilize that area of the abdomen, there's always going to be some bacteria left behind, and if there's enough, then that can cause an abscess to form." (Nathan Depo. at 34.) Dr. Nathan did not have an opinion as to why Tim continued to have abscesses, but he opined that the procedures utilized by appellee's medical personnel in treating Tim's abscess formation during that time "was completely appropriate." (Nathan Depo. at 45.)

{¶ 68} During examination by appellants' counsel, Dr. Nathan disagreed that the calcification found on the March 1, 2015 CT scan was consistent with the appendicolith identified on the February 23, 2015 CT scan. According to Dr. Nathan, "the idea that a six-millimeter calcified structure could shrink to three millimeters within a week is implausible." (Nathan Depo. at 78.) He further stated "calcified objects don't shrink over such a course of time. The calcium doesn't just dissolve." (Nathan Depo. at 98.)

{¶ 69} During further examination by counsel for appellee, Dr. Nathan stated: "The radiopaque object on the * * * February CT was contained within an abscess not very far from the appendix, and so I think the most likely etiology of that is that it was an appendicolith." He further stated that "[t]he tiny calcification that's seen on the March 1st CT scan is in a different part of the abdomen. It is contained within some inflammatory soft tissue, and it's half the size of what I measured the appendicolith to be about a week earlier. So I think it's not the appendicolith." (Nathan Depo. at 97.)

{¶ 70} As noted, appellants' theory of liability with respect to the appendectomy surgery was that Dr. Eiferman was negligent in failing to remove an appendicolith during the laparoscopic appendectomy performed on February 24, 2015. Here, the parties did not disagree with the Court of Claims' determination that the standard of care in performing the appendectomy required Dr. Eiferman to search for and remove the appendicolith identified in the pre-operative CT scan, as long as it could be safely removed. The primary issue in dispute was whether the object identified on the post-operative CT scan was the appendicolith identified on the pre-operative CT scan. As indicated, appellants' expert, Dr. Silverman, testified that the calcified structure appearing on the CT scan of March 1, 2015 was "an appendicolith." (Tr. at 91.) By contrast, both experts for appellee disagreed, stating that the object observed on the March 1, 2015 CT scan was not the appendicolith shown on the pre-operative CT scan taken approximately one week earlier.

{¶ 71} As set forth above, in its decision, the Court of Claims found persuasive the testimony of Dr. Nathan, who stated the calcification observed on the March 1, 2015 CT scan was in "a different part of the abdomen, * * * contained within some inflammatory soft tissue," and that it was "about half the size of what Dr. Nathan measured the appendicolith to be." The court also found persuasive the testimony of Dr. Steinberg, citing that expert's testimony that the calcified structure was "smaller than the previously identified appendicolith," and that it was "most likely not the same thing." The Court of Claims further cited Dr. Steinberg's testimony that the original appendicolith "appeared to be calcified, and calcified appendicoliths would not change very rapidly, if at all." (Decision at 12.)

{¶ 72} By contrast, the Court of Claims found the testimony of Dr. Silverman "less credible" than those offered by appellee's experts. (Decision at 12.) Specifically, the court found that Dr. Silverman lacked the credentials of the opposing experts.

{¶ 73} The record also indicates Dr. Silverman was the only expert who opined that an appendicolith appeared on the post-operative CT scan taken March 1, 2015. In this respect, we note the testimony of Dr. Silverman conflicted with the opinion of appellants' other expert, Dr. Schaefer, whose deposition testimony was read into the record at trial. When questioned as to whether, following the laparoscopic appendectomy, the appendicolith was identified in any subsequent post-operative CT scans, Dr. Schaefer responded: "To my knowledge, no." When asked whether he had an explanation for that, Dr. Schaefer stated: "It dissolved." (Tr. at 551.)

{¶ 74} The instant case, "in simple terms, was a battle of the experts" as to whether the standard of care was breached. *Beranek v. Shope*, 7th Dist. No. 20 BE 0011, 2020-Ohio-7024, ¶ 34. In such a case, in which "the issue of whether the defendant has employed the requisite care must be determined from the testimony of experts," it was "within the province of the trier of fact to weigh the medical testimony and to resolve the conflicting opinions." *Gordon* at ¶ 77. As outlined above, appellants presented the testimony of their experts, including Dr. Silverman, who opined that an appendicolith was found on the post-operative CT scan. Appellee, however, presented controverting evidence through the testimony of its medical experts who both concluded the object found on the post-operative scan was not the appendicolith identified on the pre-operative CT scan, and who further testified that Dr. Eiferman met the standard of care in performing the laparoscopic appendectomy. Here, the record contains competent, credible evidence which, if believed, supports a determination that Dr. Eiferman did not breach the standard of care. While appellants presented contrary evidence, it was within the sole province of the trier of fact to weigh the credibility of the witnesses and to resolve the conflicts in the evidence, including conflicting testimony on the factual issue whether an appendicolith remained following the laparoscopic appendectomy. Based on the record presented, we are unable to conclude the trier of fact lost its way and rendered an opinion which was clearly against the manifest weight of the evidence.

{¶ 75} Appellants' first assignment of error is not well-taken and is overruled.

{¶ 76} We will address appellants' second and third assignments in inverse order. Under the third assignment of error, appellants assert the Court of Claims erred in permitting habit testimony in violation of Evid.R. 406. Specifically, appellants argue the Court of Claims erred in permitting Dr. Eiferman to testify that his habit would have been

to remove all appendicoliths during an appendectomy. Appellants further contend the Court of Claims permitted this testimony over appellants' objection and without Dr. Eiferman providing the necessary foundation to meet the requirements of Evid.R. 406.

{¶ 77} Evid.R. 406, which governs the admissibility of habit evidence, states: "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." A habit has been "defined as a person's regular practice of meeting a particular kind of situation with a specific type of responsive conduct." *Mulford-Jacobs v. Good Samaritan Hosp.,* 1st Dist. No. C-950634 (Nov. 20, 1996), citing McCormick, *Evidence*, Section 195, at 825 (4 Ed.Strong Ed. 1992).

{¶ 78} It has been noted that "[t]he rationale for the admission of evidence of habit pursuant to Evid.R. 406 is that habitual acts may become semi-automatic and may tend to prove one acted in the particular case in the same manner." *Bollinger, Inc. v. Mayerson*, 116 Ohio App.3d 702, 715 (1st Dist.1996). In order for evidence of habit to be admissible at trial, "it must establish a regular or routine practice," and "[e]vidence as to one or two isolated occurrences does not establish a sufficient regular practice for admission pursuant to Evid.R. 406." *Id.*, citing *Cannell v. Rhodes,* 31 Ohio App.3d 183 (8th Dist.1986); *Bolan v. Adams,* 19 Ohio App.3d 206 (11th Dist.1984). Further, "[t]he proponent of habit evidence must first establish that the habit in fact exists and then show that the stimulus for the habitual response occurred on a particular occasion." *Id.*

{¶ 79} Under Ohio law, Evid.R. 406 "has been applied in * * * medical contexts to establish that the witness's routine practice was adhered to in the situation before the court as to which the witness has no particular recollection." *Burris v. Lerner,* 139 Ohio App.3d 664, 671 (8th Dist.2000).[1] *See, e.g., Brokamp v. Mercy Hosp.*, 132 Ohio App.3d 850, 865

---

[1] Courts in other jurisdictions have similarly applied habit evidence in the context of medical negligence actions. *See, e.g., Kornberg v. United States*, 693 Fed.Appx. 542, 544 (9th Cir.2017) (habit evidence admissible as "doctors' testimony concerning their typical practices was the type of testimony that can be admitted under [Fed.R.] 406" in case where physician testified "she had performed approximately 40 stapedectomies"); *Hamilton v. Winder*, La.App. No. 2004 CA 2644R (May 4, 2007) (physician's habit testimony was relevant "to show his practice regarding drain removal and that he followed this practice"); *Rosebrock v. E. Shore Emergency Physicians, LLC*, 221 Md.App. 1, 22 (2015) (trial court did not err in admitting physician's testimony as habit evidence where testimony included how physician cleared patient's spine, that she did it the same way each time, and the "large number of times that she performed the procedure"); *McCormack v. Lindberg*, 352 N.W.2d 30, 35 (Ct.App.Minn.1984) (habit evidence admissible; "[a]s long as it is clear that [physician] is not testifying specifically about an operation he cannot remember, he should be allowed to tell the jury how he usually performs a first rib resection").

(1st Dist.1999) (trial court did not err in admitting, under Evid.R. 406, testimony by nurse regarding his normal routine for providing injection to patient where nurse had no recollection of event and nothing in record suggested he did not act "pursuant to his normal custom" on the date in question); *Teague v. St. Luke's Hosp.,* 8th Dist. No. 59920 (Mar. 26, 1992) (trial court did not abuse its discretion in admitting, under Evid.R. 406, testimony by phlebotomist regarding blood drawing procedure where witness had no independent memory of event and where "evidence was sufficient to show that [witness] engaged in the behavior regularly enough to make it probable that he behaved that way when drawing Appellant's blood").

{¶ 80} In the present case, during direct examination of Dr. Eiferman, the following exchange occurred:

> Q. Okay. Now, give us an idea, Dr. Eiferman, how many laparoscopic appendectomies you had performed by this point in your career.
>
> I'm talking about February of 2015.
>
> A.  Probably in the hundreds by then, so 1 to 200.
>
> Q. And you mentioned during your deposition that you don't have a specific recollection of this appendectomy.
>
> Do you at least have a routine as to how you approach the procedure?
>
> A. That is true.  I do not remember this specific appendectomy. But I feel comfortable talking to you about my routine to appendectomies.
>
> Q. All right.  And have you reviewed your operative note to prepare for your testimony today?
>
> A. * * * I have.
>
> Q. And can you tell us whether or not your operative report actually reflects your routine or what you would typically do with the laparoscopic appendectomy?
>
> A. It does.  It reads pretty well.
>
> It talks about identifying the appendix and firing at the base with the stapler.  I go on in there to say that I had to separate the mesoappendix bluntly from the inflammation.  That's the

abscess cavity that we are talking about that needs to be separated out and broken up. Then I removed the appendix. And due to the abscess, I left the drain in there to try and prevent a future infection.

(Tr. at 309-10.)

{¶ 81} Dr. Eiferman testified as to how he would have used the "suction irrigator" instrument to "break up inflammatory tissue." (Tr. at 315.) He described for the court how he placed and operated the instrument, and how "the pus, the air, the fecalith, gets sucked out into this right here and goes into the suction canister right there." (Tr. at 316.)

{¶ 82} Dr. Eiferman was further questioned on direct examination as follows:

Q. When you have an appendicolith that is inside the abscess, do you have a habit or routine in how you approach it and what you do?

A. I do.

Q. And what is that, please?

A. It would be as I just described to you. It would be to use the instrument right there. You want to get out what's inside that abscess cavity, that pus, any stones, any inflammatory debris. You want to suck that out and that would be the routine.

(Tr. at 317.)

{¶ 83} "In the absence of plain error, a failure to object to evidence presented at trial constitutes a waiver of any challenge on that evidence on appeal." *Barnett v. Thornton*, 10th Dist. No. 01AP-951, 2002-Ohio-3332, ¶ 14, citing *State v. Robertson*, 90 Ohio App.3d 715, 728 (2d Dist.1993).

{¶ 84} Contrary to appellants' contention, the record does not indicate any objection was made at trial to the above testimony regarding the physician's habit or routine in performing a laparoscopic appendectomy. As cited above, Dr. Eiferman testified he lacked a memory of the specific appendectomy in this case, but the witness, who stated he had performed between 100 and 200 laparoscopic appendectomies, testified as to his routine for performing this surgery. He also described in detail the procedure he utilizes in irrigating with a suction device, demonstrating his routine for the court. Here, evidence regarding the physician's usual practice in performing a laparoscopic appendectomy was relevant, and the trier of fact was entitled to determine what weight to accord to such

evidence. Again, no objection was raised to the testimony at issue, as to either relevance or purported lack of foundation, and we conclude the Court of Claims did not commit error, plain or otherwise, in permitting Dr. Eiferman's habit testimony.

{¶ 85} Appellants' third assignment of error is without merit and is overruled.

{¶ 86} Under the second assignment of error, appellants contend the Court of Claims impermissibly permitted Dr. Nathan and Dr. Steinberg to provide speculative expert testimony, in contravention of Evid.R. 702 and 703, regarding whether Dr. Eiferman observed the standard of care in performing the appendectomy and the supposed removal of the appendicolith. With respect to the testimony of Dr. Nathan, appellants point to a response by this medical expert during direct examination in which he stated: "So it appeared that [Dr. Eiferman] used appropriate technique to divide the appendix and to remove it from the cecum as well as to divide the blood supply to the appendix. My understanding is that it's his usual practice and it would be for most surgeons to evacuate any spillage from that area, and that would include a stone." (Nathan Depo. at 29.) According to appellants, Dr. Nathan's testimony is speculative and depends on the assumption Dr. Eiferman actually followed through with his "habit." (Appellants' Brief at 29.) Appellants similarly contend the testimony of Dr. Steinberg was speculative, citing to this expert's answer to a question during direct examination in which he was asked to assume Dr. Eiferman testified it was his typical practice to remove any appendicolith he was able to observe. In response, Dr. Steinberg stated in part: "If that is what he says the standard treatment is, and it makes sense that it would be, then no, I don't think he violated the standard of care." (Tr. at 468.)

{¶ 87} In response, appellee argues appellants failed to object to the testimony they now claim was speculative, preserving all but plain error. Appellee further argues it presented significant expert testimony on the issue of whether Dr. Eiferman complied with the standard of care by removing the appendicolith and that, prior to expressing their respective opinions, each defense expert was instructed not to voice an opinion unless it was held to a reasonable degree of medical probability.

{¶ 88} In general, the admission or exclusion of evidence is governed by the rules of evidence. *See, e.g., State v. McGovern*, 6th Dist. No. E-08-066, 2010-Ohio-1361, ¶ 33 ("Admission of witness testimony is governed by the Ohio Rules of Evidence."). In this respect, a reviewing court must simply determine whether the trial court's ruling on an

evidentiary issue was correct or not based upon application of the rule and, in this sense, presents a question of law. *See State v. Depew,* 136 Ohio App.3d 129, 132 (4th Dist.1999) ("when a party challenges the trial court's construction of an evidentiary rule, he presents a question of law that we review *de novo*"). Thus, although this court sometimes speaks in terms of a trial court's discretion in addressing the interpretation of a rule, it is not discretionary in most instances. Stated otherwise, in interpreting the rules of evidence, "no court has the authority, within its discretion, to commit an error of law." *State v. Chandler,* 10th Dist. No. 13AP-452, 2013-Ohio-4671, ¶ 8.

{¶ 89} Evid.R. 702(B) states in part that a witness may testify as an expert if such witness "is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Evid.R. 703 states: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." Under Ohio law, "[e]vidence in the form of expert testimony is admissible if the witness has 'scientific, technical, or other specialized knowledge' that will assist the trier of fact in understanding the evidence or determining a question of fact." *Witherby v. G.A. Avril Co.*, 1st Dist. No. C-930493 (June 30, 1994), quoting Evid.R. 702.

{¶ 90} In challenging the testimony of Dr. Nathan as speculative, we note appellants rely in part on the testimony of their own expert (Dr. Silverman) to argue the appendicolith "would have gone back into the area near Tim's liver where it was found on the March 1 CT scan." (Appellants' Brief at 29.) Further, appellants challenge this expert's response as predicated on the assumption Dr. Eiferman actually followed through with his habit or routine in performing the procedure. We have previously found, however, the Court of Claims did not err in admitting the habit evidence under Evid.R. 406. Moreover, courts have held that whether a physician's "habitual response in fact occurred" in a particular case is a "question of weight and credibility for the trier of fact." *Mulford-Jacobs.*

{¶ 91} As to the testimony of Dr. Steinberg, and contrary to appellants' assertion, no objection was made at trial to the testimony of this expert witness, cited above, regarding the issue of standard of care. The opinion testimony of Dr. Steinberg, however, was premised on his assumption that Dr. Eiferman followed his standard routine/habit in performing the laparoscopic appendectomy. Again, we have concluded such evidence was properly before the court, and the record indicates the trier of fact credited Dr. Eiferman's

testimony that he "would have used a surgical instrument to remove any inflammatory debris." The Court of Claims was entitled to determine the weight to be accorded this testimony. Further, the Court of Claims did not err in considering the opinion testimony of Dr. Steinberg regarding the standard of care, based upon such underlying facts and evidence.

{¶ 92} The record indicates that the testimony of appellee's experts, previously recounted in addressing the first assignment of error, was based on their education, training, experience and the facts and evidence in the record. Both Dr. Steinberg and Dr. Nathan testified as to the standard of care for treating a ruptured appendix, and both witnesses opined as to whether an object identified on the March 1, 2015 post-operative scan was the same appendicolith identified on the pre-operative scan. Both experts also explained the basis of their opinions, and the evidence was not speculative. Accordingly, while it was up to the trier of fact to assess the credibility of this evidence, we find no error by the trial court in admitting the testimony at issue.

{¶ 93} Appellants' second assignment of error is not well-taken and is overruled.

{¶ 94} Based on the foregoing, appellants' three assignments of error are overruled, and the judgment of the Court of Claims of Ohio is affirmed.

*Judgment affirmed.*

LUPER SCHUSTER and BEATTY BLUNT, JJ., concur.

_____