[Cite as *Badawi v. Ohio State Univ. Wexner Med. Ctr.*, 2024-Ohio-2503.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Mohamed Badawi, Administrator of
the Estate of [M.B.],                              :

                                                   :              No. 23AP-444
             Plaintiff-Appellee,                                (Ct. of Cl. No. 2019-00122JD)

                                                   :
v.                                                             (REGULAR CALENDAR)

                                                   :
The Ohio State University
Wexner Medical Center,                             :

             Defendant-Appellant.                  :

---

D E C I S I O N

Rendered on June 28, 2024

---

**On brief:** *Kitrick, Lewis & Harris Co., L.P.A.*, and *Mark Kitrick*, and *Miller Weisbrod Olesky, LLP*, *Lawrence R. Lassiter*, and *David Olesky* for appellee. **Argued:** *Mark Kitrick*.

**On brief:** *Dave Yost*, Attorney General, and *Jeffrey L. Maloon*, and *Arnold, Todaro, Welch & Foliano Co., L.P.A.*, *Gerald J. Todaro*, and *Gregory B. Foliano* for appellant. **Argued:** *Gregory B. Foliano*.

---

APPEAL from the Court of Claims of Ohio

EDELSTEIN, J.

{¶ 1} Defendant-appellant, the Ohio State University Wexner Medical Center ("OSUWMC"), appeals from the June 14, 2023 decision and judgment entry entered by the Court of Claims of Ohio in favor of plaintiff-appellee, Dr. Mohamed Badawi, in his capacity as administrator of the estate of M.B., a deceased minor child ("the estate"). For the reasons that follow, we affirm the trial court's judgment.

**I. Facts and Procedural History**

{¶ 2} Dr. Badawi's wife, Sara Elshazli, was 40 weeks pregnant when she was admitted to OSUWMC's obstetrics unit on June 6, 2018 after showing signs of spontaneous labor. (Feb. 8, 2019 Compl. at ¶ 15; Appellee's Brief at 5.) During the pregnancy, Ms. Elshazli expressed her wishes to have a vaginal birth to Dr. Andrea Snyder, her obstetrician at OSUWMC. (Appellee's Brief at 4.) Ms. Elshazli had given birth to her first child through a cesarean section delivery, which put her at a heightened risk for uterine rupture during a vaginal birth of any subsequent pregnancies. (Compl. at ¶ 15-16.) The plan for vaginal birth was approved, with the added contingency that a cesarean section delivery would be performed if Ms. Elshazli did not go into labor by June 8, 2018. (June 14, 2023 Decision at 5.) This delivery plan is known as a "trial of labor after cesarean section" ("TOLAC"). (Decision at 5.)

{¶ 3} Once she was admitted, Ms. Elshazli was monitored with an electronic fetal heart monitor, a scalp electrode, and an internal uterine pressure catheter monitor. Eventually, a medicine known as Pitocin was administered in order to induce labor. (Compl. at ¶ 17-18.) After a shift change at 7:00 a.m. the following morning, Ms. Elshazli was placed in the care of attending physician Dr. Kara Malone, first-year resident Dr. Erin Walker, and R.N. Elizabeth Miller. (Decision at 5.) Dr. Malone examined Ms. Elshazli at approximately 8:30 a.m. after a patient evaluation was requested by Nurse Miller. (Dec. 15, 2022 Tr. Vol. 4 at 730, 852.)

{¶ 4} There were several unusual signs as labor progressed, including shoulder pain, maternal tachycardia, maternal hypertension, fetal heart rate decelerations, and decreased uterine contractility. (Compl. at ¶ 20-21; Jan. 6, 2023 Tr. Vol. 12 at 2746.)

{¶ 5} Around 9:15 a.m., Nurse Miller noticed abnormal patterns on the fetal heart monitor and alerted Dr. Malone. (Tr. Vol. 4 at 829-30.) At 10:24 a.m., Dr. Malone remotely reviewed the results from the fetal heart monitor and identified a prolonged period of deceleration that had begun at 9:21 a.m. (Tr. Vol. 4 at 830, 854, 879.)

{¶ 6} At approximately 10:45 a.m., Ms. Elshazli complained of shoulder pain and Nurse Miller, recognizing this as a potential sign of uterine rupture, sent out a request for an evaluation by the first-available physician. (Tr. Vol. 4 at 734-36.) Dr. Walker arrived shortly thereafter. During her evaluation, Ms. Elshazli informed Dr. Walker that if a

cesarean section was medically necessary, or otherwise recommended, she would follow the doctors' recommendation. Dr. Walker did not repeat this message to Dr. Malone. (Tr. Vol. 4 at 735-40; Tr. Vol. 12 at 2743.) (Appellant's Brief at 4; Appellee's Brief at 6.) Nurse Miller made a note at 12:00 p.m. that Ms. Elshazli was experiencing severe overall pain, but the shoulder pain had resolved. (Tr. Vol. 4 at 746.)

{¶ 7} At around 12:35 p.m., Nurse Miller paged Dr. Malone and called a second physician after she again observed irregular fetal heart rate patterns on the monitor. (Tr. Vol. 4 at 832-33; Tr. Vol. 12 at 2747-48.) By 12:41 p.m., Dr. Malone was at Ms. Elshazli's bedside and had identified a prolonged period of fetal heart rate deceleration from 12:28 p.m. to 12:32 p.m., along with other abnormalities. (Tr. at Vol. 4 833; Tr. Vol. 12 at 2748-50.) At this point, circumstances were changing rapidly and Dr. Malone stayed with Ms. Elshazli for the remainder of her labor. (Tr. Vol. 4 at 861.)

{¶ 8} Ms. Elshazli began to push at 1:05 p.m., Pitocin ceased to be administered at 1:12 p.m., and three additional nurses arrived to assist with labor at 1:14 p.m. (Tr. Vol. 4 at 861-62, 864.) At 1:16 p.m., Dr. Malone placed a fetal scalp electrode on the top of the baby's head to assess her heart. (Tr. Vol. 4 at 862.) At 1:18 p.m., Dr. Malone gave the order to begin an emergency cesarean delivery. (Tr. Vol. 4 at 865.) (Appellee's Brief at 7; Appellant's Brief at 6.)

{¶ 9} A uterine rupture was discovered during the cesarean section procedure and an appendage of the baby was found to have partially extruded into Ms. Elshazli's abdomen. (Compl. at ¶ 23; Decision at 5.) The baby— named M.B. by her parents—was delivered at 1:31 p.m. on June 7, 2018 with severe neurological injuries and transferred soon thereafter to Nationwide Children's Hospital for additional care. On June 8, 2018, M.B. was pronounced dead due to hypoxic-ischemic encephalopathy. Two non-treating doctors from OSUWMC performed an autopsy and determined the baby's cause of death was acute hypoxic-ischemic brain injury secondary to uterine rupture. (Compl. at ¶ 25; Appellee's Brief at 8-9.)

{¶ 10} Dr. Badawi was appointed as administrator of M.B.'s estate on December 19, 2018. (Compl. at ¶ 2.) On February 8, 2019, the estate brought this lawsuit in the court of claims against OSUWMC, as the employer of Ms. Elshazli's medical providers acting within the course and scope of their employment, for medical negligence, wrongful death, and a

survivorship claim on M.B.'s behalf under the doctrine of respondeat superior. In addition to alleging that the conduct of Ms. Elshazli's medical providers deviated from the applicable standard of care, the complaint also presented claims for failure to train, failure to gain informed consent, and improper administration of medication.

{¶ 11} The court of claims conducted a bench trial over 17 days, beginning on December 12, 2022 and ending on January 17, 2023. After the estate presented its case-in-chief, OSUWMC moved for a directed verdict. The trial court granted a partial directed verdict on the claim that OSUWMC failed to gain informed consent, a failure to train claim, a claim related to loss of support from expected earning capacity, the survivorship claim, and an improper administration of Pitocin claim. The court also granted a partial directed verdict on certain compensable damages, such as funeral costs and medical bills. (Decision at 2-3.)

{¶ 12} On June 14, 2023, the court rendered its decision in favor of the estate on its remaining claims. (Decision at 1.) The trial court summarized the gravamen of the claims before it as "whether [Dr. Malone,] [Dr. Walker,] and [Nurse Miller] were aware of the risk of uterine rupture, and whether [they] recognized and properly acted upon certain symptoms of uterine rupture in accordance with the standard of care." (Decision at 10.)

{¶ 13} The trial court observed that in medical negligence cases, the standard of care and whether the parties' conduct conformed to it are questions of fact, and the applicable standard of care must be determined from the testimony of expert witnesses. (Decision at 10-11.) Upon review of all the evidence it heard over the course of trial, the court found one of the estate's expert witnesses, Dr. Christopher Robinson, presented the most credible evidence establishing that an emergency cesarean delivery should have occurred no later than 12:54 p.m. in order to avoid the adverse outcomes posed by the uterine rupture during delivery. From this, in light of Ms. Elshazli's medical history and the "warning signs" observed during her labor, the court concluded that waiting until 1:18 p.m. to order an emergency cesarean delivery was a breach of the standard of care. (Decision at 14.) The trial court rejected OSUWMC's theory that M.B.'s injuries were present before Ms. Elshazli went into labor. (Decision at 14-15.)

{¶ 14} Having found the medical personnel who attended to Ms. Elshazli at OSUWMC deviated from the standard of care, the court turned to the issue of causation:

"Based on the previously discussed analysis of events that took place on June 7, 2018, relative to the negligence claim, this Court is convinced by a preponderance of the evidence that the negligence of Defendant's medical professionals was the proximate cause of the death of [M.B.]." (Decision at 26.) The trial court found that Dr. Malone's absence from Ms. Elshazli's room between 8:40 a.m. and 12:40 p.m., coupled with the medical team's "collective lack of situational awareness whether Elshazli may be experiencing a uterine rupture" during that same window of time, proximately caused the extensive acute hypoxic-ischemic brain injury that led to M.B.'s death. (Decision at 26-27.)

{¶ 15} Accordingly, after a review of the evidence and the applicable law, the trial court found the estate had proven its remaining claims and awarded $2,750,000 in damages. (Decision at 1-2.) This appeal followed.

## II. Assignments of Error

{¶ 16} OSUWMC sets forth the following six assignments of error for our review:

[I.] The exclusion of Dr. Landon's testimony violated OSUWMC's right to refute Badawi's use of Dr. Landon as a de facto expert.

[II.] The trial court violated Evidence Rule 803(18) and committed reversible error by improperly interpreting and substituting its opinions from a medical treatise in deliberations.

[III.] After granting OSUWMC directed verdicts on informed consent and negligent training claims, the court reversed itself and found liability on both issues.

[IV.] The trial court erred by prohibiting Dr. Stephen Thung from testifying based on his personal knowledge of "original source" information.

[V.] The court had no legally competent evidence to find liability against Erin Walker, M.D.

[VI.] The court assumed without evidence the parents suffered a lifelong mental injury which was not established by the necessary expert testimony for future damages invalidating its award as a matter of law.

## III. Law and Analysis

{¶ 17} In order to establish liability for medical malpractice, the estate was required to prove: "(1) the standard of care within the medical community; (2) the defendant's breach of that standard of care; and (3) proximate cause between the breach and the plaintiff's injuries." *Gordon v. Ohio State Univ.*, 10th Dist. No. 10AP-1058, 2011-Ohio-5057, ¶ 66. "Expert testimony is required to establish the actions of the physician fell below the standard of care and that the breach caused the plaintiff's injuries." *Jeffrey v. Marietta Mem. Hosp.*, 10th Dist. No. 11AP-492, 2013-Ohio-1055, ¶ 26, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130-31 (1976). In this context, the term "standard of care" means the recognized standard in the medical community for the relevant treatment or procedure. *Gordon* at ¶ 66.

{¶ 18} The majority of errors raised by OSUWMC concern the trial court's evidentiary rulings. In a bench trial, it is the duty of the court to resolve conflicts of fact and determine the credibility and weight that should be given to the testimony of witnesses. *Kuper v. Halbach*, 10th Dist. No. 09AP-899, 2010-Ohio-3020, ¶ 45. As the reviewing court, we give deference to the trial court's findings because "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-999, 2013-Ohio-5140, ¶ 18, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). *See also Gysegem v. Ohio State Univ. Wexner Med. Ctr.*, 10th Dist. No. 20AP-477, 2021-Ohio-4496, ¶ 74 ("[I]t [is] within the sole province of the trier of fact to weigh the credibility of the witnesses and to resolve the conflicts in the evidence."). Moreover, an "appellate court should not substitute its judgment for that of the trial court when there exists, as in this case, competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial judge." *Seasons Coal Co., Inc.* at 80.

### A. First Assignment of Error

{¶ 19} In its first assignment of error, OSUWMC alleges the trial court committed reversible error by prohibiting OSUWMC from calling Dr. Mark Landon, Chairman of the Department of Obstetrics at the Ohio State University, as an expert witness at trial. We

review the trial court's disposition of evidentiary issues for an abuse of discretion. *Stanley* at ¶ 65. An abuse of discretion occurs when "a court exercis[es] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, ¶ 35.

{¶ 20} The dispute over calling Dr. Landon as a witness began during the deposition of one of the estate's experts, Dr. Howard Mandel. During his deposition, Dr. Mandel described how Dr. Walker should have recognized symptoms associated with uterine rupture upon her initial evaluation of Ms. Elshazli. According to Dr. Mandel, the standard of care required Dr. Walker to report her findings "up the chain of command" until Ms. Elshazli received the necessary care. Dr. Mandel also noted that had Dr. Walker reported her findings to Dr. Malone without adequate response, Dr. Walker would have had the responsibility to continue up the chain of command, to Dr. Stephen Thung, and then eventually to Dr. Landon. (Mandel Dep. at 176-77.) Dr. Mandel then testified, "I am really confident that it's not speculative, that Dr. Landon would have intervened if they would have gone up the chain of command up to this level. * * * He would have walked down the hall or across the street or taken the elevator and examined the patient himself, and she would have ended up having an emergency cesarean section." (Mandel Dep. at 178-79.)

{¶ 21} Following Dr. Mandel's deposition, OSUWMC filed a motion for leave to add Dr. Landon to its list of witnesses, arguing the deposition "made it necessary for Defendant to offer Dr. Landon to refute Dr. Mandel's testimony as to what Dr. Landon would have done regarding this patient's care." (July 7, 2021 Mot. at 1.) After briefing concluded, the trial court conditionally granted the motion, stating, "Since Dr. Landon does not appear to have been identified as an expert witness for Defendant, the Court would permit Dr. Landon to testify on rebuttal at trial, ***if the issue of Dr. Landon's possible intervention is in fact raised by Plaintiff at trial***." (Emphasis added.) (July 21, 2021 Entry at 2.) At trial, the court found the issue was not raised by the estate and thus did not allow Dr. Landon to be called as a rebuttal witness, over the objection of OSUWMC.

{¶ 22} On appeal, OSUWMC does not take issue with the trial court's pre-trial determination. Instead, the parties dispute whether the issue of Dr. Landon's possible intervention was, in fact, raised by evidence presented during the estate's case-in-chief. OSUWMC asserts that although it was not directly raised, counsel for the estate routinely

referenced a chapter of an obstetrician textbook ("the chapter"), on vaginal birth after cesarean section and the attendant risk of uterine ruptures, that was authored by Dr. Landon. (Appellant's Brief at 14; Dec. 16, 2022 Tr. Vol. 5 at 1080-81.) For example, Dr. Robinson—one of the estate's expert witnesses—testified that the chapter identifies uterine rupture as the principal risk associated with TOLAC deliveries. (Tr. Vol. 5 at 1082.) He further testified as to the textbook's reliability, commonly accepted professional usage, and how its discussion of vaginal birth after cesarean section led hospitals to change their approach to offering TOLAC as a delivery option to patients. (Tr. Vol. 5 at 1082-85.) OSUWMC argues Dr. Badawi's counsel used references to the chapter "not only to create an institutional standard of care for all TOLAC patients at OSUWMC, but also as an institutional admission by a party opponent pursuant to Evid.R. 801(D)." (Appellant's Brief at 17.) As such, OSUWMC asserts that speculation as to how Dr. Landon would have responded after learning about Ms. Elshazli's symptoms was raised by inference, and thus the trial court erred when it prohibited Dr. Landon from testifying as a rebuttal witness. In addition to the above, OSUWMC also suggests it was entitled to call Dr. Landon to testify about the standard of care after the estate's counsel "opened the door" on the issue during depositions. (Appellant's Brief at 25.)

{¶ 23} On the other hand, the estate asserts none of the experts—including Dr. Mandel, who did not testify at trial—speculated about how Dr. Landon would have responded if he had been informed of the circumstances of Ms. Elshazli's labor. Therefore, the estate argues that because the condition did not occur and the issue was never raised by the estate, the trial court did not abuse its discretion by barring Dr. Landon's testimony. We agree.

{¶ 24} The trial court's pre-trial ruling would have permitted rebuttal testimony from Dr. Landon only "if the issue of Dr. Landon's possible intervention [was] in fact raised by Plaintiff at trial." (July 21, 2021 Entry at 2.) But, on review, we find the record contains no testimony from any of the estate's witnesses speculating about how Dr. Landon would have handled the labor and delivery in *this* specific case. That topic is wholly distinct from references to Dr. Landon's place in the hospital hierarchy and his academic writing on the subject generally.

{¶ 25} This distinction is underscored by OSUWMC's argument for calling Dr. Landon during trial, which shows the true intended purpose of Dr. Landon's testimony was to "explain how Badawi's counsel and his experts were mischaracterizing and misinterpreting his learned treatise." (Appellant's Brief at 10.) During trial on December 16, 2022, OSUWMC renewed its request to call Dr. Landon as a rebuttal witness, first reminding the court of the "back history" with Dr. Mandel's deposition testimony, and then discussing how throughout the course of trial, Dr. Landon's chapter had been "misquoted, about what these aspects [from the chapter] mean in the face of a concurrent uterine rupture." (Tr. Vol. 5 at 1258-59.) Referring to the chapter, counsel for OSUWMC further stated, "There's been so much emphasis on [the chapter,] that somehow it's not only a reliable text that, you know, this is somebody that you answer to in your department. In fairness, Judge, we need to get Dr. Landon to explain [the chapter] to put it in its proper orbit." (Tr. Vol. 5 at 1262.)

{¶ 26} Upon instruction from the trial court, OSUWMC submitted a notice of their renewed request, accompanied by excerpts from the trial transcript highlighting where they believed Dr. Landon's text was incorrectly interpreted. (Dec. 19, 2022 Def. Notice.) After the estate filed a response, the court verbally overruled the motion on December 20, 2022. (Dec. 20, 2022 Tr. Vol. 7 at 1359.) The court issued a written entry on January 11, 2023 memorializing that ruling. In that entry, the court explained the two-part basis for its ruling. First, "Since Dr. Mandel has not testified in this case, and will not be testifying in this case, the Court's Entry of July 21, 2021, has become moot." (Jan. 11, 2023 Entry at 2.) Second, the court concluded that OSUWMC wanted to call Dr. Landon, "not because any of Plaintiff's witnesses testified to anything related to Dr. Mandel's testimony about Dr. Landon (that is, that Dr. Landon would have called for an immediate C-Section) but because a sentence at page 452 from Dr. Landon's chapter * * * was 'mischaracterized' during the Plaintiff's case." (Jan. 11, 2023 Entry at 2.)

{¶ 27} OSUWMC seems to concede on appeal what is evident from the trial transcript—it wanted to call Dr. Landon not for the limited purpose identified in the trial court's July 21, 2021 order (which it does not assign error to on appeal) but to address what it argues were mischaracterizations of his medical text. Because the condition identified by the trial court in its pre-trial ruling was not triggered by any witness speculating about how

Dr. Landon would have intervened in this particular case, we find the trial court did not abuse its discretion in barring Dr. Landon's testimony at trial.

{¶ 28} For the foregoing reasons, OSUWMC's first assignment of error is overruled.

## B. Second Assignment of Error

{¶ 29} OSUWMC's second assignment of error concerns whether the trial court improperly interpreted and relied on a learned treatise in violation of Evid.R. 803(18). OSUWMC claims the trial court misinterpreted and erroneously relied on information gleaned from Dr. Landon's textbook chapter to conclude the hospital's employees violated the applicable standard of care by failing to timely recognize and respond to the uterine rupture. (Appellant's Brief at 29.) We review this assignment of error for an abuse of discretion. *Stanley*, 2013-Ohio-5140 at ¶ 65, citing *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 83.

{¶ 30} On appeal, OSUWMC identifies three specific statements in the trial court's decision where, it asserts, the court misinterpreted and erroneously relied on Dr. Landon's chapter. All three statements are contained in one paragraph of the decision:

> Yet another reason advanced by those critical of this portion of Dr. Robinson's testimony bears more discussion: whether a uterine rupture must be "sudden." Dr. Gabbe's text on uterine rupture, Chapter 20 (written by Dr. Landon, of The Ohio State University, and Dr. William B. Grobman), states that "Uterine Rupture ***can be*** catastrophic, sudden, and unpredictable." (Emphasis added). Counsel have repeatedly brought this sentence to the attention of the Court, and, after careful consideration of the testimony, and a review of that portion of the Chapter, this Court interprets this sentence to mean that uterine rupture does not have to be sudden, although it certainly can be. It is painfully evident that uterine rupture can be catastrophic (again, this is not always so), and it is also clear that uterine rupture is unpredictable. That unpredictability is noted in the sentence immediately following the above quoted sentence, which reads as follows: "Persons who care for women undergoing TOLAC should be familiar with electronic FHR patterns that may be associated with uterine rupture as well as the potential need for emergent delivery." A sentence preceding the above two quoted sentences reads as follows: "Studies that have examined fetal heart rate (FHR) patterns before uterine rupture consistently report that nonreassuring signs, particularly prolonged decelerations or bradycardia, are the most common signs of uterine rupture." (Emphasis in the original). And in addition to the above quoted text, other testimony in this case clearly

> confirms the unpredictability of uterine rupture, as well as pointing out the relative importance of fetal heart rate patterns. And no other testimony (or textbook information) gives the slightest hint that uterine rupture is predictable. There are indicators, or signs, but nothing that can directly predict a uterine rupture.

(Emphasis sic and omitted.) (Decision at 20-21.)

{¶ 31} For its first example of alleged improper interpretation and reliance, OSUWMC points to the trial court's analysis and determination that Ms. Elshazli, already at heightened risk as a TOLAC patient, exhibited earlier "warning signs" that were evidence of an ongoing uterine rupture. (Appellant's Brief at 29-30.) OSUWMC argues this determination was based on the trial court's finding that " 'uterine rupture does not have to be sudden, although it certainly *can be*' " and that this finding was based on the court's independent interpretation of a sentence from Dr. Landon's chapter that states, "uterine rupture *can be* catastrophic, sudden, and unpredictable." (Emphasis added and omitted.) (Appellant's Brief at 29, citing Decision at 20.)

{¶ 32} For its second example, OSUWMC cites a portion of the paragraph from the trial court's decision discussing fetal heart rate patterns that quotes from Dr. Landon's chapter: " 'Persons who care for women undergoing TOLAC should be familiar with electronic FHR * * * patterns that may be associated with uterine rupture as well as the potential need for emergent delivery.' " (Emphasis omitted.) (Appellant's Brief at 30, quoting Decision at 20-21.) OSUWMC argues this reference to the chapter indicates the trial court incorrectly relied on the treatise to emphasize the importance of fetal heart rate patterns in determining the standard of care, absent any corresponding expert testimony. (Appellant's Brief at 30.)

{¶ 33} For its third and final example of the trial court's purported misinterpretation and improper reliance on Dr. Landon's chapter, OSUWMC points to the following from the trial court's decision: " 'A sentence preceding the above two quoted sentences * * * reads as follows: "Studies that have examined fetal heart rate (FHR) patterns before uterine rupture consistently report that non[-]reassuring signs, particularly prolonged decelerations or bradycardia, are the most common signs of uterine rupture." ' " (Emphasis omitted.) (Appellant's Brief at 31, quoting Decision at 21.) OSUWMC asserts this sentence demonstrates how the trial court independently concluded from the text that instances of

deceleration in M.B.'s fetal heart rate pattern should have alerted the medical staff to the possibility of a uterine rupture. (Appellant's Brief at 31.)

{¶ 34} OSUWMC concedes that learned treatise statements meeting the qualifications of Evid.R. 803(18) may be treated as probative evidence, so long as the statements are not received as exhibits and given undue weight. (Appellant's Brief at 33.) Here, there is no indication that Dr. Landon's chapter, or excerpts from it, were admitted as exhibits. However, due to the trial court's direct quotations from Dr. Landon's chapter, OSUWMC argues the court "[took] the chapter as an exhibit on its own accord." (Appellant's Brief at 33.) From this, OSUWMC asserts the trial court improperly crafted a standard of care from its independent interpretation of the treatise, instead of the testimony of expert witnesses as was required. (Appellant's Brief at 27-28.)

{¶ 35} The "learned treatise" exception to the general prohibition against hearsay permits "statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice" if "called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination." Evid.R. 803(18). If such statements are admitted, they "may be read into evidence but may not be received as exhibits." *Id.* "The rationale behind this hearsay exception is that a finder of fact should have the benefit of expert learning on a subject, even though it is hearsay, so long as the authority of a treatise is sufficiently established." *Bradley v. Ohio DOT,* 10th Dist. No. 11AP-409, 2012-Ohio-451, ¶ 19.

{¶ 36} Both parties agree *Bradley* is relevant to our analysis of this issue. In *Bradley*, the trial court erroneously admitted a learned treatise as an exhibit. On appeal, we held that although error, no prejudice resulted from admission of the exhibit because "the trial court did not refer to or rely on any portion of the text that [the expert] had not discussed and explained in his testimony." *Id.* at ¶ 24. Here, OSUWMC argues the trial court improperly relied on portions of the text that were not addressed by expert witnesses, while Dr. Badawi asserts all three references to the chapter were appropriately interpreted through expert witness testimony.

{¶ 37} At the outset, we note the trial court itself stated "other testimony in this case clearly confirms the unpredictability of uterine rupture, as well as pointing out the relative importance of fetal heart rate patterns. And no other testimony (or textbook information) gives the slightest hint that uterine rupture is predictable." (Decision at 21.) And our independent review of the trial transcript confirms the same.

{¶ 38} The first example cited by OSUWMC concerns the trial court's determination that a uterine rupture can be ongoing and does not have to be sudden. This conclusion was derived, in part, from a portion of Dr. Landon's chapter that was read into the record and states a uterine rupture "can be" sudden. The trial court used the chapter's statement that a uterine rupture "can be" sudden to reach a conclusion that it may not always be sudden. This is not an instance where expert testimony is required—it is a concept that requires only common knowledge to understand it. Under the common knowledge exception, "matters of common knowledge and experience, subjects which are within the ordinary, common and general knowledge and experience of mankind, need not be established by expert opinion testimony." *Anderson v. Eli Lilly & Co.*, 10th Dist. No. 15AP-479, 2015-Ohio-5239, ¶ 14, quoting *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 103 (1992). If something ***can be*** sudden, its corollary is that the act is ***not always*** sudden. Because this portion of the text could be understood by any lay person without the assistance of expert testimony, we find no error.[1]

{¶ 39} As for OSUWMC's second example, expert testimony supported the trial court's finding that familiarity with fetal heart rate patterns is an aspect of the applicable standard of care for medical professionals providing care to a TOLAC patient. Nurse Miller agreed with this statement during trial. (Tr. Vol. 4 at 780.) So, too, did expert witnesses Nurse Susan Drummond (Jan. 5, 2023 Tr. Vol. 11 at 2319) and Dr. Katherine Strafford (Jan. 4, 2023 Tr. Vol. 10 at 2034). And so, here, just as in *Bradley*, "the trial court did not refer to or rely on any portion of the text that [an expert] had not discussed and explained in his [or her] testimony." *Bradley* at ¶ 24.

---

[1] Even if this interpretation went beyond a lay person's understanding, the trial court also ***did*** tie its analysis to expert testimony on the same subject. (*See, e.g.*, Decision at 12.)

{¶ 40} And as for the third and final example cited by OSUWMC, the trial transcript confirms multiple experts testified about the importance of evaluating irregular fetal heart rate patterns when caring for TOLAC patients. Indeed, Dr. Malone, herself, testified that she knew non-reassuring signs in fetal heart rate patterns are the most common sign of a uterine rupture and that she was aware of this in 2018. (Tr. Vol. 4 at 930.) So, too, did Nurse Miller (Tr. Vol. 4 at 770) and Dr. Walker (Tr. Vol. 5 at 1048). In addition, there was testimony from expert witnesses, such as Dr. Robinson, who testified to the same. (*See, e.g.*, Tr. Vol. 5 at 1214-15.) We fail to see how the trial court, in its role as finder of fact, improperly relied on a medical text to reach its judgment when the text met the requirements of the learned treatise exception under Evid.R. 803(18) and was presented in concert with expert testimony establishing the same.

{¶ 41} Finding no abuse of discretion, we overrule the second assignment of error.

**C. Third Assignment of Error**

{¶ 42} In its third assignment of error, OSUWMC asserts the trial court reversed its previous directed verdicts on informed consent and negligent training by finding liability on both issues in its decision and judgment entry. OSUWMC claims the trial court "resurrected" these claims and "blindsided OSUWMC with a decision on issues it was informed were resolved." (Appellant's Brief at 36.)

{¶ 43} According to OSUWMC, reversal on the informed consent claim came in the following statement: " 'Since the position of OSUWMC is that the patient has the right to make her own medical decisions, Elshazli's request * * * should have been followed, or, at a minimum, discussed in more detail with her. Again, this did not happen.' " (Emphasis omitted.) (Appellant's Brief at 36, quoting Decision at 19.) And OSUWMC asserts reversal of the negligent training claim resulted from the following finding: "And while Defendant is a teaching and academic hospital, and this Court gives some deference to that situation, it must be said that leaving a TOLAC patient to be attended by a first[-]year resident (and a registered nurse with only slightly more experience), presents risks of its own." (Appellant's Brief at 38, quoting Decision at 17-18.)

{¶ 44} We do not find merit to either argument. Both sentences, read in context, clearly indicate the trial court's attempt to set the stage for its subsequent finding on the standard of care (and breach thereof), not a reversal of its prior decisions.

{¶ 45} The first statement was part of the trial court's broader description of the series of events leading up to M.B.'s delivery. The timeline of events concluded with the trial court stating, "These factors called for situational awareness. * * * This is the medical reason that situational awareness must be taken into account; yet, it was not done here." (Decision at 19-20.)

{¶ 46} As to the second statement, the purpose of describing OSUWMC as a training hospital and acknowledging the limited experience of both Nurse Miller and Dr. Walker was not to resurrect the negligent training claim, but to illustrate its finding that the continued absence of the experienced attending physician under the facts and circumstances of this case violated the standard of care. The court did not suggest either Dr. Walker or Nurse Miller was negligently or improperly trained. Instead, the court noted that, in the absence of Dr. Malone, the responsibility of evaluating the progress of Ms. Elshazli's labor and appreciating the import of the "warning signs" she exhibited was ultimately left to a nurse and a first-year resident who reasonably had limited practical experience attending to TOLAC patients. (*See* Decision at 23 ("The record is clear that for four hours, from 0840 to 1240, Dr. Malone was not present in the same room as Elshazli. This, in and of itself, is not a breach of the standard of care. However, when warning signs of uterine rupture present—as they did here—her absence left Elshazli with two persons essentially responsible for her care: Dr. Walker and Nurse Miller. Dr. Walker had never treated a TOLAC patient before, and she was a first-year resident at the time. This Court believes that had Elshazli not been a TOLAC patient, the care provided by Dr. Walker and Nurse Miller would have been sufficient to meet the standard of care.").)

{¶ 47} Furthermore, in its decision, the trial court acknowledged it had already granted directed verdicts for OSUWMC on the estate's claims regarding informed consent, failure to properly train resident physicians and nurses, and improper administration of Pitocin. (Decision at 2-3.) With that in mind, the court properly defined the scope of the remaining issues for trial: "The gravamen of Badawi's remaining allegations concern whether, on June 7, 2018, Defendant, through its medical team who cared for Elshazli and her unborn child, breached a duty of care to Elshazli and her unborn child, whether injuries in this case are the proximate result of the breach, and what damages, if any, should be awarded." (Decision at 3.) (*See also* Decision at 10 ("whether Kara Malone, M.D., Erin

Walker, M.D., and Elizabeth Miller, R.N. ***were aware of the risk of uterine rupture***, and whether Dr. Malone, Dr. Walker, and Ms. Miller ***recognized and properly acted upon certain symptoms of uterine rupture*** in accordance with the standard of care") (Emphasis added); Decision at 14 ("[T]he main issue in this case, since it is manifest that a uterine rupture did occur, is to determine, by a preponderance of the evidence, whether Defendant, through its medical team, ***acted appropriately*** when certain signs presented, or whether, by a preponderance of the evidence, Elshazli ***should have been transported*** for a Cesarean section at any time before 1254 hours.").) (Emphasis added.) Nowhere in the decision does the trial court suggest it should revisit its previously granted directed verdicts or engage in any further analysis relating to those claims.

{¶ 48} Accordingly, we overrule OSUWMC's third assignment of error.

### D. Fourth Assignment of Error

{¶ 49} In its fourth assignment of error, OSUWMC asserts the trial court erred in limiting testimony from Dr. Thung at trial.

{¶ 50} We review the trial court's disposition of evidentiary issues for an abuse of discretion. *Stanley*, 2013-Ohio-5140 at ¶ 65. "[A]buse of discretion connotes that the court's attitude is unreasonable, arbitrary or unconscionable." (Internal quotations omitted.) *State v. Weaver*, 171 Ohio St.3d 429, 2022-Ohio-4371, ¶ 24, quoting *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 60, quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "A decision is unreasonable if there is no sound reasoning process that would support the decision." (Internal quotations omitted.) *Fernando v. Fernando*, 10th Dist. No. 16AP-788, 2017-Ohio-9323, ¶ 7, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). A decision is arbitrary if it is made "without consideration of or regard for facts [or] circumstances." (Internal quotations omitted.) *State v. Hill*, 171 Ohio St.3d 524, 2022-Ohio-4544, ¶ 9, quoting *State v. Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16, ¶ 12, quoting *Black's Law Dictionary* 125 (10th Ed.2014). A decision may also be arbitrary if it lacks any adequate determining principle and is not governed by any fixed rules or standards. *See Beasley* at ¶ 12, citing *Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 359 (1981), citing *Black's Law Dictionary* 96 (5th Ed.1979). *See also State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-

6699, ¶ 19. A decision is unconscionable if it "affronts the sense of justice, decency, or reasonableness." *Fernando* at ¶ 7, citing *Porter, Wright, Morris & Arthur, LLP v. Frutta Del Mondo, Ltd.*, 10th Dist. No. 08AP-69, 2008-Ohio-3567, ¶ 11. An abuse of discretion may also be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶ 15 (8th Dist.).

**{¶ 51}** "Error in the admission or exclusion of evidence is grounds for reversal only where substantial rights of the complaining party were affected or substantial justice appears not to have been done." *Jarvis v. Hasan*, 10th Dist. No. 14AP-578, 2015-Ohio-1779, ¶ 70, citing *Faieta v. World Harvest Church*, 10th Dist. No. 08AP-527, 2008-Ohio-6959, ¶ 73. And, "to establish that a substantial right has been affected, one must show that the alleged error affected the final determination of the case." *Lips v. Univ. of Cincinnati College of Medicine*, 10th Dist. No. 12AP-374, 2013-Ohio-1205, ¶ 49.

**{¶ 52}** At the time of M.B.'s delivery, Dr. Thung was the Chief of Obstetrics at OSUWMC ***and*** a member of the hospital's quality assurance committee, which, in addition to other duties, reviews hospital policies and procedures and evaluates certain medical outcomes experienced by the department's patients. In fact, he participated in the hospital's formal review of Ms. Elshazli's labor and M.B.'s death.[2] (Thung Dep. at 20, 39-40.) In addition to serving on the quality assurance committee, Dr. Thung learned about M.B.'s delivery in a more direct way. Shortly after M.B.'s death, Dr. Thung happened upon Dr. Badawi crying in a hospital hallway. Dr. Thung attempted to comfort Dr. Badawi and assured him he would look into what happened, in hopes of bringing some answers to the family. (Tr. Vol. 12 at 2882-85.) Dr. Thung met with the parents in June and August of that year in this more informal capacity. (Thung Dep. at 14.)

**{¶ 53}** As a result of this good-faith gesture, Dr. Thung inadvertently created two investigative roles for himself with regard to M.B.'s death—first, as a member of the committee that would formally investigate and review the actions taken by hospital staff

---

[2] At times throughout Dr. Thung's deposition and in the trial transcript, the committee is referred to by various names, including the quality and safety committee (Thung Dep. at 39-40), the quality program (Thung Dep. at 20), the safety and quality committee (Tr. Vol. 12 at 2886), the quality assurance team (Tr. Vol. 12 at 2885), the review committee (Decision at 24), and the quality assurance committee (Appellee's Brief at 47). For clarity, we use the term "quality assurance committee" throughout the decision.

during labor and delivery, and second, as a hospital employee who promised to look into the matter independent of his role on the committee. Thus, while Dr. Thung did not provide medical care to Ms. Elshazli, nor was he brought by either party as an expert witness, he was called to testify at trial on a relatively narrow factual issue: the conversations he had with Dr. Badawi and Ms. Elshazli following M.B.'s death.

{¶ 54} There is an inherent tension in these dual roles due to the privileged nature of the workings of a quality assurance committee. Pursuant to R.C. 2305.24, "[a]ny information, data, reports, or records" made available to a hospital's quality assurance team "are confidential and shall be used by the committee and the committee members only in the exercise of the proper functions of the committee." A member of a peer review committee "cannot be asked about the individual's testimony before the peer review committee, information the individual provided to the peer review committee, or any opinion the individual formed as a result of the peer review committee's activities." R.C. 2305.252(A). However, as this court has noted, the privilege "does not render all information pertaining to an incident beyond the scope of discovery." *Doe v. Mt. Carmel Health Sys.*, 10th Dist. No. 05AP-435, 2005-Ohio-6966, ¶ 18. "A person may testify, or produce evidence[] regarding patient care that is within his or her personal knowledge." *Id. See also* R.C. 2305.252(A).

{¶ 55} The estate deposed Dr. Thung in preparation for trial. In addition to discussing OSUWMC's policies and procedures, academic literature he and his colleagues authored, and his various roles in the hospital, Dr. Thung was also asked about his meetings with Dr. Badawi and Ms. Elshazli during the deposition. At trial, the estate played portions of Dr. Thung's deposition testimony showing he was unable to provide the family an explanation for why M.B. died when he spoke with them in 2018. After these excerpts of Dr. Thung's deposition testimony were played for the court, OSUWMC called Dr. Thung as a witness to rebut any negative inferences the court might draw from that testimony. During OSUWMC's direct examination of Dr. Thung, the following exchange occurred:

> Q. Were you able to explain to the family what went --
> anything that went wrong in labor and delivery?
>
> A. No, I was not.
>
> * * *

Q. So when you spoke with the family, were you able to give them a reason why this happened?

A. I was not.

Q. And why not?

A. Because I didn't know the answer.

Q. And why didn't you know the answer?

A. Honestly, I still don't know the answer. I was surprised.

* * *

Q. At your deposition, did you tell [counsel for the estate] that you didn't know that hypoxic-ischemic damage -- brain damage was the reason the baby died?

A. That is correct.

Q. And why did you tell him that at the deposition?

A. Because I don't know that -- I don't know why the baby died.

(Tr. Vol. 12 at 2896-2921.) OSUWMC then went on to ask Dr. Thung why he could not give the family a reason for M.B.'s death. The estate objected, asserting Dr. Thung never disclosed an opinion on the issue during his deposition because the hospital repeatedly invoked the statutory peer review committee privilege. (Tr. Vol. 12 at 2852.)

{¶ 56} Following argument from both parties, the trial court limited Dr. Thung's testimony through an oral ruling on the bench. (Tr. Vol. 12 at 2856-57.) OSUWMC filed a motion for reconsideration on January 9, 2023, along with a written proffer of Dr. Thung's testimony that ultimately concluded with an opinion that "given everything he reviewed to speak with the family, this was an unpredictable and unpreventable event." (Def.'s Combined Mot. for Recons. and Proffer of Testimony of Stephen Thung, M.D. at 7-8.) The trial court denied the motion for reconsideration in an order issued on January 11, 2023. In its written decision, the court noted that "[t]he parties have agreed that peer review materials are not discoverable." (Jan. 11, 2023 Entry at 3, citing R.C. 2305.24, 2305.25, and 2305.251.) Applying the relevant statutory authority to the instant case, the court stated, "[I]t is clear that Dr. Thung is absolutely prohibited, absent a waiver of the privilege which has not been asserted here, from giving testimony regarding any materials that were used by the Quality Assurance Committee." (*Id.* at 4.) After its own independent review of

Dr. Thung's deposition transcript, the court concluded that OSUWMC repeatedly invoked the privilege to prevent Dr. Thung from discussing any matters or materials related to the quality assurance committee investigation and Dr. Thung was unable to separate out his independent source knowledge from the information he gained from his role on the quality assurance committee. As such, the court concluded, "to allow OSUWMC to shield information during discovery and then potentially utilize such shielded information at trial would result in manifest injustice." (*Id.* at 5.)

{¶ 57} On appeal, OSUWMC claims Dr. Thung should have been permitted to testify to his independent review of materials in preparation for his meetings with Dr. Badawi and Ms. Elshazli and to explain why "he could not say why the baby died." (Appellant's Brief at 50.) Specifically, it contends that Dr. Thung should have been permitted to explain the following at trial:

> Had Dr. Thung testified, he would have explained why he did not think hypoxic ischemia from this uterine rupture led to [M.B.]'s death. He would have testified that the rupture occurred just prior to delivery and, given the rapidity of delivery, he would have expected this baby to survive. He would have testified that from his review of records to meet with the family, he found no evidence of an ongoing uterine rupture or indication for earlier delivery. He would have testified he looked for 'red flags' which would require an earlier delivery and found none. These are the answers to why he could not tell them why the baby died.

(Internal citation omitted.) (Appellant's Brief at 56-57.) OSUWMC blames the estate for failing to ask questions during Dr. Thung's deposition that would have led to discovery of this information.

{¶ 58} For us to conclude that the trial court abused its discretion in finding OSUWMC invoked the privilege to prevent Dr. Thung from answering the "why" question, we would have to find the court's decision was unreasonable, arbitrary, or unconscionable. *See Weaver*, 2022-Ohio-4371 at ¶ 24. Upon our own independent review of the transcript from Dr. Thung's deposition, we are unable to do so. In fact, we find numerous instances where the estate asked Dr. Thung to explain why he was surprised by the outcome in this case and the hospital invoked the privilege. (*See, e.g.*, Thung Dep. at 46-48, 53-54, 56-58.) As such, we cannot say the trial court abused its discretion in concluding the privilege was

repeatedly invoked to prevent Dr. Thung from answering the estate's questions about why M.B. died.

{¶ 59} Additionally, we cannot conclude the trial court abused its discretion in finding Dr. Thung was unable to separate out his independent source knowledge from the information he learned through his work on the quality assurance committee. During his 2021 deposition, Dr. Thung was able to provide only minimal information about his discussions with Dr. Badawi and Ms. Elshazli based on his independent source knowledge. Dr. Thung was not able to recall what documents he reviewed and how he prepared for his meetings with Dr. Badawi and Ms. Elshazli. (Thung Dep. at 44, 46, 50.) Understandably so, because he did not take contemporaneous notes and the conversations happened over three years before his deposition. (Thung Dep. at 18, 20, 22, 44, 46.) In fact, Dr. Thung could not recall with certainty how many times he met with the family. (*See, e.g.*, Thung Dep. at 13-14, 22.) He recalled that his first meeting with the family occurred in June 2018, he was still carrying out his quality assurance committee duties with respect to this case in July 2018, and he had a second meeting with the family in August 2018. (Thung Dep. at 16-18.) And, he could not recall what documentation he reviewed in preparation for those meetings. (*See, e.g.*, Thung Dep. at 44-46 (explaining he could not recall whether the autopsy was available at the time, and, if so, whether he reviewed it before speaking with the family in August 2018; also recalling he had accessed the quality assurance committee records by that time).) When directly asked whether he did anything to investigate the family's concerns, Dr. Thung responded, "Yes, this case went through this -- our quality review process" and "I did quite a few things, but that was within the quality program." (Thung Dep. at 20.) (*See also* Thung Dep. at 54, 56.) He was unable to articulate any concrete steps he took independent of the committee.

{¶ 60} To find the trial court erred in concluding Dr. Thung could not adequately distinguish between his original source knowledge and the knowledge he gained from his role on the quality assurance committee, we would have to reweigh and reinterpret Dr. Thung's statements during his deposition. That is not our role. Instead, applying the abuse of discretion standard of review, we see extensive evidence to support the trial court's decision below.

{¶ 61} Because we cannot say the trial court abused its discretion in limiting Dr. Thung's trial testimony, OSUWMC's fourth assignment of error is overruled.

### E. Fifth Assignment of Error

{¶ 62} OSUWMC argues in its fifth assignment of error that there was no legally competent evidence to support the trial court's finding that Dr. Walker breached the applicable standard of care. However, we do not need to address the substance of this argument because, resolved either way, it does not affect the outcome of the case and thus any error would be harmless.

{¶ 63} It is well-established under this court's precedents that "[i]f a physician 'was an employee or agent of appellee, then liability might be imposed upon appellee for any negligent acts performed by that physician under the doctrine of respondeat superior.' " *Gysegem*, 2021-Ohio-4496 at ¶ 34, quoting *Latham v. Ohio State Univ. Hosp.*, 71 Ohio App.3d 535, 537-38 (10th Dist.1991). "If the Court of Claims determines [an] employee is immune from liability, the claimant in the underlying action must assert his or her claims against the state and the state shall be liable for the employee's deeds or omissions." *Poe v. Univ. of Cincinnati*, 10th Dist. No. 12AP-929, 2013-Ohio-5451, ¶ 7. *See also Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208, ¶ 12; *Ries v. Ohio State Univ. Med. Ctr.,* 10th Dist. No. 11AP-1004, 2012-Ohio-1766, ¶ 13.

{¶ 64} OSUWMC conceded Dr. Malone, Dr. Walker, and Nurse Miller were "acting in the course and scope of their respective employment in the treatment of [M.B.]." (Mar. 7, 2019 Answer at ¶ 5.) Thus, the trial court found Dr. Malone, Dr. Walker, and Nurse Miller were acting on behalf of OSUWMC during all relevant times. (Decision at 8.) In this assignment of error, OSUWMC disputes only whether there was sufficient evidence to find Dr. Walker negligent; they have not extended this argument to Dr. Malone or Nurse Miller. Regardless of whether there was sufficient evidence to find Dr. Walker acted negligently, OSUWMC is already liable for the negligent acts of Dr. Malone and Nurse Miller. So, even if the trial court erred as to Dr. Walker, such error would be harmless.

{¶ 65} Accordingly, OSUWMC's fifth assignment of error is overruled.

**F. Sixth Assignment of Error**

{¶ 66} Lastly, OSUWMC asserts in its sixth assignment of error that the trial court erred by concluding Dr. Badawi and Ms. Elshazli suffered a lifelong mental injury from the loss of their baby when the finding was not supported by expert testimony.

{¶ 67} The award of damages is a matter for the trier of fact, and will not be disturbed on appeal " 'absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive or inadequate.' " *Zavinski v. Ohio DOT*, 10th Dist. No. 18AP-299, 2019-Ohio-1735, ¶ 40, quoting *Pesic v. Pezo*, 8th Dist. No. 90855, 2008-Ohio-5738, ¶ 21. R.C. 2125.02(A) sets forth a rebuttable presumption that parents have suffered damages by reason of a child's wrongful death. *See In re Estate of Payne*, 10th Dist. No. 04AP-1176, 2005-Ohio-2391, ¶ 7. As factfinder, a trial court is expressly authorized by that statute to award damages "as it determines are proportioned to the injury and loss." R.C. 2125.02(C)(1). To determine damages, a trial court considers "all factors existing at the time of the decedent's death that are relevant to a determination of the damages suffered by reason of the wrongful death." R.C. 2125.02(C)(2)(b)(i).

{¶ 68} On appeal, OSUWMC asserts that "[c]ase law in Ohio is clear: if a permanent injury is asserted that is beyond the mere understanding of lay persons, expert testimony is required to submit the same to the finder of fact for consideration." (Reply Brief at 20.) We agree. However, we disagree with OSUWMC's claim that an expert was needed in this case to establish the permanency of the emotional pain suffered by two parents who experienced the traumatic delivery of a baby following uterine rupture and had to make the decision to end the baby's life after an otherwise healthy pregnancy. Instead, like the trial court, we find it is self-evident from the circumstances of this case.

{¶ 69} Even if we were to agree with OSUWMC that expert testimony was needed to establish the lifelong impact of the trauma the parents experienced in this case, we find such testimony was provided by the parents' treating psychologist, Dr. Judith Dygdon. At trial, Dr. Dygdon testified that while the parents' mental health is likely to improve over time, they will never be restored to the lives they led before their daughter's immediate and traumatic death. (*See* Dec. 13, 2022 Tr. Vol. 2 at 492-93; Tr. Vol. 7 at 1421-22.)

{¶ 70} For these reasons, based on the facts and circumstances of this case, we cannot find any basis to reverse the trial court's damages award. Accordingly, we overrule OSUWMC's sixth assignment of error.

## IV. Disposition

{¶ 71} Having overruled all six of OSUWMC's assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

MENTEL, P.J. and BEATTY BLUNT, J., concur.